Jeffrey P. Lendrum (137751)
**LENDRUM LAW FIRM**
A Professional Corporation
401 West "A" Street, Suite 2330
San Diego, CA 92101
Telephone: (619) 239-4302
Facsimile: (619) 239-4307
Email: jpl@lendrumlaw.com

Attorney for Petitioner Lisett Di Donato–Young

FILED
AUG 22 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ECL DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

LISETT DI DONATO-YOUNG, an individual,

Petitioner,

vs.

WACHOVIA SECURITIES, LLC, a Delaware Corporation,

Respondent.

Case No. '08 CV 1557 W RBB

**MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF PETITION**

*[filed concurrently with Petition to Vacate Arbitration Award; Notice of Lodgment; Declaration Of Jeffrey P. Lendrum In Support Of Petition to Vacate Arbitration Award; Declaration Of V. Michael Arias In Support Of Petition to Vacate Arbitration Award; Declaration Of Lisett Di Donato-Young In Support Of Petition to Vacate Arbitration Award and, [Proposed] Order]*

| | |
|---|---|
| Hearing Date: | To Be Determined |
| Hearing Time: | To Be Determined |
| Judge: | To Be Determined |
| Courtroom: | To Be Determined |



CR

## TABLE OF CONTENTS


| | | | | PAGE |
|---|---|---|---|---|
| A. | PRELIMINARY STATEMENT | | | 1 |
| B. | JURISDICTION AND VENUE | | | 4 |
| C. | FACTUAL BACKGROUND | | | 5 |
| | 1. | Ms. Di Donato's Background And Employment With Wachovia | | 5 |
| | 2. | The Incident Resulting In Ms. Di Donato's Termination | | 7 |
| | 3. | Wachovia Fails To Mitigate Its Alleged Losses | | 8 |
| | 4. | Wachovia Voluntarily Elects To Purchase The Bonds From Corpbanca | | 9 |
| | 5. | The Promissory Note | | 9 |
| D. | STANDARD OF REVIEW | | | 11 |
| E. | ARGUMENT | | | 13 |
| | 1. | The Award Must Be Vacated Because It Was Rendered Manifest Disregard Of The Law | | 13 |
| | | A) | The Claims Asserted By Wachovia | 13 |
| | | B) | California's Well-Settled Employee/Employer Indemnification Laws | 14 |
| | | C) | Petitioner's Answer Expressly Asserted As An Affirmative Defense That Wachovia Claims Failed As A Matter Of Law Because Wachovia Was Never Found Liable To A Third Party Based On Ms. Di Dinoto's Conduct. | 16 |
| | | D) | The Panel's Finding Of Liability Against Ms. Di Donato Was Rendered In Manifest Disregard For The Law | 18 |
| F. | CONCLUSION | | | 19 |

# TABLE OF CITATIONS

PAGE(S)

*Beth Israel Medical Center v. Local 814*, 2000 WL 1364367 (S.D.N.Y. 2000)..............12

*Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 US 193 (2000)........................5

*Coutee v. Barington Capital Group, L.P., et al.*, 336 F.3d 1128 (9th Cir. 2003)..............12

*G.C.& K.B. Inves., Inc. v. Wilson*, 326 F.3d 1096 (9th Cir. 2003)..............................12

*Grissom v. Vons Cos., Inc*, 1 Cal. App. 4th 52 (1991)............................................14

*Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2nd Cir. 1998)....................................12

*Jacobus v. Drambo Corp.*, 78 Cal. App. 4th 1096 (2000)...................................14, 15

*Liberio v. Vidal*, 240 Cal.App.2d 273 (1966).........................................................15

*O'Hara v. Teamsters Union Local #856*, 151 F. 3d 1152 (9th Cir. 1998)....................................................3, 15, 16, 17, 18, 19

*Poweragent, Inc. v. Electronic Data Systems Corp.* 358 F.3d 1187 (9th Cir. Feb. 25, 2004)..........................................................................................12

*St. Paul Fire & Marine Ins. v. Cunningham*, 257 F.2d 731 (9th Cir.1958)..................3, 16

*Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998)............................................12

*Takacs v. A.G. Edwards And Sons, Inc.*, 444 F. Supp. 2d 1100 (S.D. Cal. 2006)..... .........15

*Theis Research, Inc. v. Brown & Bain*, 240 F3d 795 (9th Cir. 2001) ............................5

*California Corporations Code* § 317.....................................................................13

*California Labor Code* § 2865..............................................................3, 13, 15, 16, 18

*California Labor Code* § 2802...........................................................................13, 15

*California Labor Code* § 2802(a)...........................................................................13

*California Labor Code* § 2804..............................................................................15

9 U.S.C. §§ 9-11, *et seq. (Federal Arbitration Act)*..............................................1, 5

9 U.S.C. §§ 10-11 (Federal Arbitration Act) ............................................................11

28 U.S.C. § 1332.....................................................................................................4

Petitioner LISETT DI DONATO-YOUNG ("Di Donato" or "Ms. Di Donato") respectfully submits this Petition to Vacate the Arbitration Award entered in NASD Case No. 06-05141 on June 2, 2008, pursuant to 9 U.S.C. §§ 9-11, *et seq.*, and applicable case law.

## A. PRELIMINARY STATEMENT

This Petition seeks to vacate the split-decision arbitration Award entered against Ms. Di Donato in favor of her former employer, Wachovia Securities, LLC's ("Wachovia Securities") in the matter styled *Wachovia Securities, LLC v. Lisett Di Donato-Young,* NASD Case No. 06-05141 (the "Arbitration").[1]

Ms. Di Donato is a thirty-six (36) year old women who is responsible for raising her four (4) year old daughter while her husband is away serving our country in the United States Marine Corps.

At the time of the events giving rise to the Underlying Arbitration, Ms. Di Donato was a successful Financial Advisor working in Wachovia Securities' San Diego branch office. Given her Latin American background, Ms. Di Donato primarily catered to a Latin American clientele.

On March 2, 2006, Ms. Di Donato was contacted by one of her Chilean institutional clients, Corpbanca, and asked if Wachovia was interested in purchasing bonds held by Corpbanca valued at approximately $4,000,000US. Before responding to Corpbanca's inquiry, and while a representative of Corpbanca was on the telephone, Ms. Di Donato placed a call to Wachovia Securities' bond trading desk to obtain a quote for the bonds. In this recorded conversation, Ms. Di Donato understood that Wachovia Securities' bond trader made a firm bid (i.e. offer) to purchase the bonds from Corpbanca at a specified price. Ms. Di Donato then conveyed the offer to the client. Thereafter, Ms. Di Donato caused her assistant to generate a "Bloomberg" confirmation slip which was

---

[1] The Arbitration also included employment related cross-claims by Ms. Di Donato against Wachovia. Those claims were denied by the arbitrators and will not be addressed in this Petition.

then sent to Corpbanca.[2]

Within thirty minutes of the communication with Corpbanca, and before Corpbanca tendered the bonds to Wachovia, Ms. Di Donato was informed that Wachovia was taking the position it did not make a "firm" bid to buy the bonds.[3] Unfortunately, within that thirty minute period, the price of the bonds declined in value. Thus, a dispute arose between Corpbanca and Wachovia as to who should bear the costs of the market fluctuation on the bonds.[4]

While continuing to deny any obligation to honor the trade with Corpbanca, on March 14, 2006, Wachovia made a **business decision** to purchase the bonds from Corpbanca. The rationale for Wachovia's decision is reflected in a May 1, 2006 email from Gene Ingargiola, Wachovia Securities' Senior Vice President Complex Branch Manager, to Terry Chase, Wachovia Securities' Western Regional President, which stated:

> After questioning Lisett and speaking with our trading desk and listening to the tapes from the trading desk of Corpbanca, it was determined that **while we had no legal obligation to honor Ms. Di Donato's indiscretion**, we would buy the bonds from Corpbanca at the price Lisett had quoted and incur a loss to the branch of more than $172,000. [Emphasis Added]

Notice Of Lodgment In Support Of Petition To Vacate Arbitration Award (NOL) Ex. 6, p 34.[5]

Once the trade was honored, Wachovia Securities demanded that Ms. Di Donato

---

[2] A Bloomberg confirmation is an unofficial notice routinely used to confirm institutional trades, such as the one Ms. Di Donato believed had been consummated. It is not an official firm confirmation, but it was and continues to be routinely used throughout Wachovia Securities and other brokerage firms. The Bloomberg confirmation is nothing more than information that might have been conveyed by the broker to her client by way of telephone, e-mail or fax.

[3] Wachovia admitted listening to the recorded conversation and despite knowing that Ms. Di Donato was requesting a copy of the taped conversation, Wachovia elected to delete the conversation, thus depriving Ms. Di Donato the ability to prove that she in fact received a firm bid from the Wachovia trader.

[4] When Wachovia first learned of the disputed order, the price difference between the price quoted by Ms. Di Donato for the bonds and the market price was roughly $66,000. Wachovia, however, devised a "game plan" to dispute the trade with Corpbanca for roughly ten (10) days. See NOL, Ex. 6, p. 6. During that time, the bond price further declined. Thus, Wachovia was solely responsible for causing its alleged "loss" to increase by nearly 300%.

[5] When asked at the arbitration hearing for a detailed explanation for Wachovia's decision to settle, Wachovia asserted the attorney-client privilege and refused to explain its decision.

sign a Promissory Note for $172,000. While Ms. Di Donato was reviewing the Promissory Note, she was terminated. Wachovia Securities then initiated the Underlying Arbitration. As reflected in Wachovia Securities' Statement Of Claim, the only "damages" or "losses" Wachovia claims to have suffered was the cost of covering the bonds that Wachovia purchased from Corpbanca. Amended Statement Of Claim, NOL, Ex. 1.

On June 2, 2008, a panel of three arbitrators entered a split 2/3 decision finding that Ms. Di Donato must reimburse Wachovia for $172,000 representing the entire alleged "loss" on the bonds, plus $37,266.67 in pre-judgment interest. NOL, Ex. 3.

As demonstrated below, the Award was rendered in manifest disregard of controlling Ninth Circuit law. As reflected in the May 1, 2006 email quoted above, it was undisputed that Wachovia Securities' alleged "loss" was **not** the result of a judgment rendered against Wachovia Securities in favor of a third-party, but rather Wachovia Securities' voluntary business decision to honor the trade with Corpbanca in an effort to retain Corpbanca's business.[6]

When the Award was issued, the arbitrators were aware that controlling Ninth Circuit authority mandates, as a matter of law, that an employer **cannot** obtain indemnity from its employee under the facts of this case because the "loss" was not the result of a judgment rendered against Wachovia. See, California Labor Code Section 2865; *O'Hara v. Teamsters Union Local #856*, 151 F. 3d 1152, 1160 (9th Cir. 1998) (hereafter "*O'Hara*"); *St. Paul Fire & Marine Ins. v. Cunningham*, 257 F.2d 731, 732 (9th Cir.1958).

Indeed, the Ninth Circuit in *O'Hara* addressed the precise issue presented in the Arbitration, namely, whether an employer may obtain indemnity against an employee where the employer "settles" a dispute with a third party. In doing so, the *O'Hara* Court affirmed summary judgment in favor of the employee, finding that where the employer

---

[6] According to email obtained through discovery, Corpbanca generated in excess of $1 million in annual revenue to Wachovia and Wachovia Securities was instructed to take appropriate action to preserve the relationship with Corpbanca. See Section, C4, *infra*.

voluntarily elects to settlement an issue with a third party, "**there is no set of circumstances under which the [employer] could prove an entitlement to indemnity.**" Id.

Despite knowing Wachovia's alleged damages were **not** based on a "judgment" against Wachovia, and thus as a matter law Wachovia could not prevail on its indemnity claims, two of the three arbitrators awarded Wachovia the full amount of its indemnity claim, plus interest! This decision is indefensible and necessitates vacating the entire Award.

In addition to suffering substantial damage as a result of being terminated and Wachovia publicly reporting that Ms. Di Donato engaged in conduct tantamount to "fraud," absent the Award being vacated, Ms. Di Donato faces the possibility of losing her securities license, and job, because she does not have the financial means to pay the Award within the period mandated under the rules of the Financial Industry Regulatory Authority (FINRA).

Ms. Di Donato respectfully seeks an order vacating the Award in its entirety, or alternatively, remanding the Award with instructions to the Panel to clarify the basis of the Award in light of the clear prohibition against indemnification under the fact of this dispute.

## B. <u>JURISDICTION AND VENUE</u>

Jurisdiction exist over this dispute under 28 U.S.C. § 1332 (diversity). At all times mentioned herein, Ms. Di Donato was and continues to be, a resident of California, residing in San Diego Country. See Declaration Of Lisett Di Donato In Support Of Petition To Vacate Arbitration Award, ¶ 2.

At all times herein, Wachovia was a Limited Liability Company, organized under the laws of the state of Delaware, with its principal place of business in St. Louis Missouri. Declaration Of Jeffrey P. Lendrum In Support Of Petition To Vacate Arbitration Award, ¶ 3-4, NOL Ex. 8 and Ex. 9. Finally, the amount of the Award at issue is well in excess of $75,000. NOL Ex. 3.

Venue is proper in this District because the Ms. Di Donato is a resident of San Diego and the acts and alleged losses at issue arose entirely out of decisions made by the San Diego branch of Wachovia. Di Donato Decl. ¶ 2. Moreover, the *Federal Arbitration Act* is applicable to these proceedings. (9 U.S.C. §§ 9-11.)[7]

## C. FACTUAL BACKGROUND

### 1. Ms. Di Donato's Background And Employment With Wachovia

Ms. Di Donato began her career with Prudential Securities Incorporated ("Prudential Securities") as a trainee in April 1998. Ms. Di Donato was from Venezuela and had numerous contacts in that country. From the very beginning of her career with Prudential Securities, Ms. Di Donato focused her energies on developing a client base in Latin America. Ms. Di Donato spent a considerable amount of her own money to travel to Latin America to meet with and develop client relationships.

For over six years Ms. Di Donato struggled to bring in clients from Venezuela and other Latin American countries. Prudential Securities did almost nothing to assist Ms. Di Donato in developing the Non-Resident Alien business ("NRA"). In fact, Prudential Securities did little to assist Ms. Di Donato with growing her business, either domestic or foreign. When accounts were re-assigned after other brokers left the firm, Ms. Di Donato was given few, if any, accounts. When she asked her manager why she was not receiving any accounts, she was told that since she had focused her efforts on NRA business, she was not going to receive domestic accounts. Despite the clear violation of Prudential Securities' policies regarding distribution of accounts, Ms. Di Donato overcame the obstacles and began to flourish with her NRA business.

In 2004, Prudential Securities and Wachovia Securities merged, with Wachovia taking over the securities business, including Ms. Di Donato's branch. Despite the

---

[7] Though the arbitration hearing took place in Los Angeles, the venue provisions of the FAA are permissive and are not mandatory. Thus proceedings under 9 U.S.C. §§ 9-11 may be brought in any district where the action which venue would otherwise be appropriate under the general federal venue statutes. See, *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.* 529 US 193, 195 (2000); *Theis Research, Inc. v. Brown & Bain,* 240 F3d 795, 796 (9th Cir. 2001).

turmoil and problems encountered with the merger, Ms. Di Donato persevered. When mistakes were made by Wachovia Securities' operations, as her manager explained to her, Wachovia would not pay for its mistakes and if Di Donato wanted to keep the clients, she would have to pay for the errors. Ms. Di Donato paid for those errors on numerous occasions, because she believed it was not right to make the client pay for those errors.

Despite the difficulties surrounding the merger, Ms. Di Donato continued to service her clients and travel to Latin America (at her own expense) to develop new business clients for herself and Wachovia Securities. Ms. Di Donato started work early in the day and worked late into the night to develop and service clients. Even though Ms. Di Donato often worked in excess of forty hour weeks for Wachovia Securities, she was never paid for those overtime hours.

At the time of her termination, Ms. Di Donato had over $450 million in assets under management. She was generating almost $1 million in annual revenue for the firm and was on track to generate approximately $2 million in gross revenues for 2006. Her payout on her gross production was approximately 43%. Had she obtained other employment prior to her termination, she could have commanded anywhere from 75% to 150% of her "trailing twelve" months gross, as a sign-on bonus.

Due to the manner in which Wachovia Securities terminated Ms. Di Donato and Wachovia Securities' delay in filing her Form U-5, she was unable to obtain a sign-on bonus. Ms. Di Donato was eventually able to obtain employment at UBS International, where she received a salary of $6,000 per month for six months and no sign-on bonus. She has only been able to transfer less than $50 million in assets. Ms. Di Donato's most productive client was a hedge fund that Wachovia Securities advised her would have to be shut down, because Wachovia Securities did not want that type of business. However, after Ms. Di Donato was terminated, that account was transferred to a Wachovia Securities' broker in New York where it continues to generate significant profits for the firm.

**2. The Incident Resulting In Ms. Di Donato's Termination**

On or about March 2, 2006, Ms. Di Donato received a telephone call at her home, from Corpbanca, one of her clients in Chile. Corpbanca was a foreign financial institution and it wanted to sell $4 million in Peruvian bonds. Using another telephone (while keeping her client on the other phone), Ms. Di Donato called her trading desk at Wachovia Securities and spoke with the trader. Over the next several minutes, Ms. Di Donato discussed the proposed transaction alternately with the trader and with her client. Based on her discussions with the trader, Ms. Di Donato understood that the transaction was done and so advised her client that the transaction had been consummated.

Following the firm's customary practices with regard to transactions for an international financial institution, Ms. Di Donato called her assistant and asked that a Bloomberg confirmation be sent to the client, detailing the trade.

The Bloomberg confirmation was sent from the Wachovia Securities branch and would have been reviewed by the branch manager or his delegate. Thus, Ms. Di Donato's supervisors were aware that the Bloomberg confirmation was or had been sent. An official confirmation would have been sent the next day and would not have been received by the Latin American client many days later.

Within thirty (30) minutes of informing Corpbanca that Wachovia would purchase the bonds, Ms. Di Donato learned from the trader that the trade had not been consummated, because the bid was allegedly not "firm." Ms. Di Donato called several of her other clients to find out if any of those clients would be interested in buying the bonds. She was unable to locate a buyer. Ms. Di Donato then spoke to the trader again and was advised by the trader that since (a) no transaction had taken place; (b) the quote had not been a "firm" bid; and (c) the report of a trade was in error, that Wachovia Securities was not obligated to purchase the bonds and that Ms. Di Donato should advise the client of the mistake. Ms. Di Donato then called Corpbanca to let it know that the trade had not been consummated as she had earlier advised them. At that time, however, the price of the bonds had dropped from approximately $115.10 per bond to $113.50.

At that point in time, the client could have sold the bonds at $113.50. At the end of the day, the bonds closed at $113.50. However, the client did not sell the bonds, electing to hold onto them.

**3. Wachovia Fails To Mitigate Its Alleged Losses**

On March 6, 2006, Ms. Di Donato's branch manager (who had been out of the office on the day of the incident) was fully briefed on the situation. After listening to the details, the branch manager told Ms. Di Donato that he would not cover the error and to advise the client that the trade was not consummated. Ms. Di Donato's manager explained to her that since the matter was simply an error in advising the client of a trade and the client had been informed almost immediately that no trade had taken place, that the firm was not liable for the miscommunication.

**4. Wachovia Voluntarily Elects To Purchase The Bonds From Corpbanca**

While Wachovia Securities was continuing to deny any obligation to purchase the bonds from Corpbanca, on March 14, 2006, **without even the threat of a lawsuit by the customer**, Wachovia Securities voluntarily elected to purchase the bonds from Corpbanca at the price quoted by Ms. Di Donato. At that time, Ms. Di Donato was informed by her manager, Gene Ingargiola, that Wachovia Bank insisted that the trade be honored because Corpbanca was a very good client of Wachovia Bank.

Wachovia Bank's insistence that Wachovia Securities take whatever action was necessary to maintain the relationship with Corpbanca, is reflected in an email dated March 16, 2006 from Carlos Singer, Wachovia Bank's Director Country Manager Chile, Peru and Bolivia, which states:

> Corpbanca is one of our key institutional relationships in Chile. It is the fourth largest bank and generates about $1.00MM in revenues. The complex situation described below [the Di Donato trade] arose out of a lack of institutional coverage of this bank. Corpbanca was being covered by a broker out of the San Diego office of Wachovia Securities. We do not know the details regarding the trade, but it clearly hurt our overall relationship with the bank. They have now cancelled a meeting we had arranged next week with a visitor from Wachovia. There is a great deal of business at stake with Corpbanca and we need your help so that these types of events are minimized in the future.

NOL, Ex. 6, p. 20.

At the arbitration, Raymond P. Valencia, the Wachovia Securities Regional Senior Vice President, was asked why Wachovia Securites decided to purchase the bonds from Corpbanca. Mr. Valencia testified:

> Based on [legal advice] and based on the fact that we had market risk still taking place and we've already had a lapse of 11 or 12 days, I made the decision we needed to cover the trade. **We needed to end our market risk**. [Emphasis added].

NOL Ex. 7, p. 258-259.[8]

Even after Wachovia decided to purchase the bonds from Corpbanca, Ms. Di Donato's Branch Manager was continuing to take the position that (1) Corpbanca was "partially" at fault for the order error, and (2) Wachovia was never "obligated" to purchase the bonds from Corpbanca.

On April 3, 2006, Gene Ingargiola, Wachovia Securities' Senior Vice President Complex Branch Manager, sent an email to Ray Valencia, Wachovia's Regional Administrative Manager for the Western Region, stating: "**My position has been that they [Corpbanca] are [sic] at least partially at fault [for the trading error]**". NOL Ex. 6, p. 28. Mr. Ingargiola goes on to recommend that Corpbanca's request for lost "interest" be **denied**. Id.

With respect to Wachovia's alleged "obligation" to purchase the bonds, on May 1, 2006 Mr. Ingargiola sent an email to Terry Chase, Wachovia Securities' Western Regional President, stating:

> After questioning Lisett and speaking with our trading desk and listening to the tapes from the trading desk of Corpbanca, it was determined that **while we had no legal obligation to honor Ms. Di Donato's indiscretion**, we would buy the bonds from Corpbanca at the price Lisett had quoted and incur a loss to the branch of more than $172,000. [Emphasis Added]

---

[8] Ms. Di Donato was never able to fully discover the basis for Wachovia's decision to purchase the bonds because Wachovia asserted the attorney-client privilege and refused to explain its decision.

NOL Ex. 6, p 34.

Consistent with Mr. Ingargiola's email, and presumably in response thereto, on May 1, 2006, Lisa Sowers of Wachovia Securities' sent an email to James Cameron, of Wachovia Securities' stating:

> **In reading the explanations below I am having a hard time understanding why (1) we felt obligated to purchase these bonds from the customer…**

NOL, Ex. 6, p. 35. [Emphasis Added].

In short, the evidence presented at the arbitration was overwhelmingly clear. Wachovia's alleged "losses" or "damages" were self-imposed! Indeed, Wachovia was never found "guilty" for harm allegedly caused by Ms. Di Donato and the decision by Wachovia to purchase the bonds from Corpbanca was voluntary and purely in an effort to preserve the business relationship with Corpbanca.

**5. <u>The Promissory Note</u>**

On or about March 16, 2006, Wachovia Securities presented Ms. Di Donato with a document entitled "Broker Error Promissory Note" in the amount of $172,094.45 ("the Note"). NOL, Ex. 5, Ex. A. The Note expressly acknowledges that the alleged error was "attributable to an error or mistake in handling a client transaction." Although, Wachovia Securities was fully aware of the circumstances surrounding the incident, Wachovia Securities elected to treat the matter as nothing more than a mistake or error. There were no recriminations made that Ms. Di Donato had falsified information, made misrepresentations or committed any acts of misconduct. Ms. Di Donato was not accused of having misrepresented herself to the client, or to have made knowing and false representations to the client or to Wachovia Securities.

As Ms. Di Donato read the Note, she observed several discrepancies in the language of the Note. Ms. Di Donato advised her manager that she wanted an attorney to review the Note, before she signed it. Later, with the branch manager's knowledge, Ms. Di Donato went to visit an attorney in order to obtain legal advice. As she was returning to her branch office from the meeting with the attorney, Ms. Di Donato received a call on

her cell phone from her branch manager, who told her that she was being terminated, effective immediately, and she was not to return to the branch.

Ms. Di Donato was not even permitted to enter the branch to recover her personal belongings. The very same day that she was terminated, her client accounts were distributed to other brokers in the office. Those brokers were instructed to retain the clients and their business.

## D. STANDARD OF REVIEW

Although the *Federal Arbitration Act* ("FAA") creates a strong presumption favoring arbitration and limits review of arbitrators' decisions, there are specific statutory and judicially created exceptions to this general rule.[9] Indeed, it is well settled in the Ninth Circuit that the Court may vacate an arbitration award if the conduct of the arbitrators violated the FAA, or if the award itself is "completely irrational" or

---

[9] The relevant sections of the *United States Code* are 9 U.S.C. §§ 10-11, as set forth below:

Section 10. Same; vacation; grounds; rehearing

(a) In any of the following cases the United States Court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration

 (1) Where the award was procured by corruption, fraud, or undue means.
 (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
 (3) Where the arbitrators were guilty of misconduct in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
 (4) Where the arbitrators exceed their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made.
 (5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

(b) The United States district court for the district wherein an award was made that was issued pursuant to section 590 of Title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 582 of Title 5.

Section 11. Same; modification or correction; grounds; order

In either of the following cases the United States Court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration.

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
(c) Where the award is imperfect in matter of form not affecting the merits of the controversy. The order may modify and correct the award, so as to affect the intent thereof and promote justice between the parties.

"constitutes manifest disregard of the law." *G.C.& K.B. Inves., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003).

In *Coutee v. Barington Capital Group, L.P., et al.*, 336 F.3d. 1128 (9th Cir. 2003), the Court articulated the appropriate standard of review to establish "manifest disregard" of the law:

> We may vacate an arbitration award 'only if that award is completely irrational, exhibits a manifest disregard of law, or otherwise falls within one of the grounds set forth in [the FAA].'
>
> [Citations omitted.] Manifest disregard of the facts is not an independent ground for vacatur in this Circuit. [Footnote omitted.]
>
> In some circumstances, however, legally dispositive facts are so firmly established that an arbitrator cannot fail to recognize them without manifestly disregarding the law. *See, American Postal Workers' Union v. United States Postal Serv.*, 682 F.2d 1280, 1284-86 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200 [1983].
>
> * * *
>
> American Postal does not establish an independent 'manifest disregard of the facts' ground for vacatur. [Citations omitted.] Rather, American Postal stands for the unexceptional proposition that a federal court will not confirm an arbitration award that is legally irreconcilable with the undisputed facts. Moreover, American Postal recognizes that because facts and law are often intertwined, an arbitrator's failure to recognize undisputed, legally dispositive facts may properly be deemed a manifest disregard for the law.

*Id.* at 1133. *See also, Poweragent, Inc. v. Electronic Data Systems Corp.* 358 F.3d 1187 (9th Cir. Feb. 25, 2004) (Same)[10].

---

[10] This rule is not unique to the Ninth Circuit. *See Beth Israel Medical Center v. Local 814*, 2000 WL 1364367 (S.D.N.Y. 2000) (While judicial review of an arbitrator's factual determinations is quite limited, a court may modify or vacate an arbitrator's award for manifest disregard of the law or the evidence if there is 'strong evidence' contrary to the findings of the arbitrator and the arbitrator has not provided an explanation of his decision.); *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2nd Cir. 1998) (Court vacated award finding strong evidence contradicting award and because no explanation or rationale for the denial of relief was proffered by the arbitrator); *Sanders v. Gardner*, 7 F.Supp.2d 151 (E.D.N.Y. 1998) (Court held if the error of arbitrators is perceivable by the average person qualified to serve as an arbitrator and a clearly governing legal principle was ignored or disregarded by the arbitrators, the award should be vacated.)

Under the undisputed facts applicable to Wachovia's claims and the arbitrators' awareness of the well-settled statutory and judicial authority applicable to the claims at issue, the Award simply is unsupportable in reason or logic, was rendered in manifest disregard for the law and must now be vacated.

## E. ARGUMENT

### 1. The Award Must Be Vacated Because It Was Rendered Manifest Disregard Of The Law.

#### A) The Claims Asserted By Wachovia.

In November 2006, Wachovia Securities filed its Statement of Claim in this proceeding. Wachovia Securities amended the Statement of Claim in December 2006, adding an additional count of culpable negligence. Wachovia's First Amended Statement Of Claim asserts the following claims against Ms. Di Donato: Misrepresentation (Count 1), Indemnity (Count 2), and Indemnity Pursuant to California Labor Code Section 2865 (Count 3). NOL Ex. 1.

Each of the claims, regardless of its title, is based on one alleged wrong, namely, Ms. Di Donato informing Corpbanca that Wachovia would purchase the bonds at a specified price. Similarly, the only alleged "loss" suffered by Wachovia was solely the result of Wachovia's decision to purchase the bonds from Corpbanca. Indeed, the claims and alleged losses are summarized in the Statement Of Claim, as follows:

> As a result of Respondent's knowing and intentional misconduct, Wachovia was obligated to purchase the 4 million Republic of Peru bonds from client at a price that was materially higher than the market price of the bonds, which resulted in losses to Wachovia in an amount in excess of $172,000.
>
> NOL, Ex. 1, p 3-4 ll:25-2.

Consistent with the Statement of Claim, the arbitrators recognized in the Award that each of the claims at issue was based on Wachovia's decision to purchase the bonds from Corpbanca. Specifically, the Award summarizes the claims presented to the panel as follows:

> Claimant [Wachovia] seeks to recover losses incurred as a result of Respondent's alleged misrepresentations to a client wherein the claimant was obligated to purchase bonds and incurred losses.

NOL, Ex. 3, p 2 of 6.

Based on the foregoing, it is undisputed that the arbitrators recognized and understood that regardless of the terminology used by Wachovia, the claims were based solely on a theory of "indemnity" and the only "loss" was the result of Wachovia's decision to purchase the bonds from Corpbanca.

### B) <u>California's Well-Settled Employee/Employer Indemnification Laws.</u>

California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of employment. That public policy has been codified in two statutes, California Labor Code § 2802 and California Corporations Code § 317.

Under Labor Code § 2802, an employer must indemnify its employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties ..." Lab. C. § 2802(a). The duty to indemnify includes the obligation to pay for the cost of the employee's defense as well as any settlement or judgment resulting from a third-party action based on conduct within the course and scope of employment. *Grissom v. Vons Cos., Inc* 1 Cal. App. 4th 52, 55 (1991).

Section 2802 further obligates the employer to indemnify employees against both meritorious and unfounded claims. The employer must indemnify for conduct within the course and scope of employment regardless of the merits of the claim and regardless of whether the employee is exonerated of wrongdoing. *Jacobus v. Drambo Corp.,* 78 Cal. App. 4th 1096, 1101 (2000). Specifically, the *Jacobus* court held:

> An employer is vicariously liable for risks broadly incidental to the enterprise undertaken by the employer-that is, for an employee's conduct that, in the context of the employer's enterprise, is 'not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.

Id. See also, *Takacs v. A.G. Edwards And Sons, Inc.*, 444 F. Supp. 2d 1100, 1124 (S.D. Cal. 2006) (same).

Finally, an employee's conduct may fall within the scope of employment "even though the act does not benefit the employer, even though the act is willful or malicious, and even though the act may violate the employer's direct orders." *Jacobus v. Drambo Corp.*, 78 Cal. App. 4th at 1102.

The public policy in favor of indemnifying employees for losses is so strong that employers cannot bargain for a release or waiver of an employee's right to indemnification under Labor Code § 2802. See Lab. C. § 2804; *Liberio v. Vidal* 240 Cal.App.2d 273, 276 (1966).

California Labor Code Section 2865 addresses indemnification from the employee to the employer, and provides: "An employee who is guilty of a culpable degree of negligence is liable to his employer for the damage thereby caused to the employer." Id.

There are two threshold requirement for indemnification under Section 2865: (1) the employee must be found "guilty", and (2) the conduct must rise to the level of "culpable negligence". In *O'Hara*, the Ninth Circuit reviewed a District Court's order granting summary judgment against an employer that was seeking indemnity from an employee pursuant to Section 2865. As in this Arbitration, the employer in *O'Hara* elected to resolve a dispute with a third party arising out of the conduct of a former employee.[11] First, the Court addressed the meaning of the term "guilty" as contained in Section 2865. In doing so, the Court stated: "'Guilty' is the key word" under Section 2865. With respect to the proof that is required to satisfy the "guilty" element of a 2865 claim, the *O'Hara* Court held that the threshold finding of "guilt" can only be satisfied "where '**a judgment** has been rendered against an employer for damages occasioned by the unauthorized negligent act of his employee' [citation]." Id. at 1161.

---

[11] Unlike the instant case, the employer in *O'Hara* was actually sued by a third party for losses allegedly caused by the employee.

The *O'Hara* Court then affirmed the granting of summary judgment against the employer stating:

> As O'Hara's claims against the Leals and union were settled with no admission of wrongdoing, it is self-evident that there has been no judgment nor any determination of guilt. **As a result, there is no set of circumstances under which the union [employer] could prove an entitlement to indemnity.** [Emphasis Added]
>
> Id. at 1160.

Indeed, *O'Hara* is not the first Ninth Circuit decision to address the requirement of a "judgment" against the employer to trigger a Section 2865 claim. In *St. Paul Fire & Marine Insurance v. Cunningham* 257 F. 2d. 731 (9th Cir. 1958), the Ninth Circuit addressed the issue of the applicable statute of limitation on a section 2865 claim. In concluding that the employer's claim was not time barred, the Court stated:

> It therefore seems clear that actions for recoupment cannot be maintained **until the loss has been ascertained, either by a judgment against the employer or the payment of a judgment.** [Emphasis added]
>
> Id. at 732.

Based on the foregoing, the law of this Circuit is well-settled that as a matter of law, an employer is barred from obtaining indemnity against an employee for losses to a third party unless, and until, the employer has first been found "guilty" by "judgment" for the conduct of the employee.[12]

## C) Petitioner's Answer Expressly Asserted As An Affirmative Defense That Wachovia Claims Failed As A Matter Of Law Because Wachovia Was Never Found Liable To A Third Party Based On Ms. Di Dinoto's Conduct.

Knowing that Wachovia's voluntary decision to purchase the bonds from Corpbanca was dispositive of Wachovia's right to seek indemnity against Ms. Di Donato,

---

[12] *St. Paul Fire & Marine Insurance* defined "judgment" in the context of a section 2865 claim as: "the term 'judgment' means a 'final judgment' entered upon final determination of the appeal." Id. 732.

Ms. Di Donato submitted an Answer which included, *inter alia*, the following affirmative defenses, among others:

> **2. SECOND AFFIRMATIVE DEFENSE**
>
> Wachovia Securities' claims are barred because it had no obligation to settle with the client. Any settlement between Wachovia Securities and the client was simply a business decision to retain a banking client for Wachovia Bank.
>
> **3. THIRD AFFIRMATIVE DEFENSE**
>
> Wachovia Securities fails to set forth any facts upon which relief can be granted, including satisfaction of any of the predicate acts necessary to state a basic claim or any requisite duty on the part of Wachovia Securities, failure to state a statutory basis for a claim, and failure to establish recoverable damages.
>
> **4. FOURTH AFFIRMATIVE DEFENSE**
>
> The claims are barred in whole or in part because Wachovia Securities sustained no legally recognized injury arising from the conduct of Ms. Di Donato.
>
> NOL Ex. 2.

Each of these affirmative defenses is an alternative means of raising the appropriate issues before the Panel to defeat Wachovia's indemnity claims.

In addition to the arbitrators being aware from Ms. Di Donato's Answer that Wachovia's claims for indemnity were fatally flawed because Wachovia was never found by a competent court to be "liable" to a third party as a result of Ms. Di Donato's conduct, this issue was also raised in briefs submitted to the arbitrators. Indeed, the Panel specifically invited the parties to submit Arbitration Briefs prior to the Arbitration. Counsel for Ms. Di Donato went to great lengths to outline the relevant law with respect to Wachovia's claims, including the *O'Hara* decision. Attached to the NOL as Ex. 5 is a true copy of Petitioner's Arbitration Brief Re Indemnity. In contrast, Wachovia, elected to not even address the *O'Hara* decision, and instead simply repeated its mantra that Ms. Di Donato's conduct was outrageous and resulted in Wachovia being "obligated" to purchase the bonds from Corpbanca. Arias Decl. ¶ 12.

In light of the defenses presented in Ms. Di Donato's Answer and the undisputed authority presented to the arbitrators, the panel was aware of the threshold requirement of a "judgment" against Wachovia, before Wachovia would have a claim for indemnity.[13]

**D) The Panel's Finding Of Liability Against Ms. Di Donato Was Rendered In Manifest Disregard For The Law.**

Based on the face of the Award, it is clear that the arbitrators understood the nature of Wachovia's claims and that each of those claims were based on Wachovia's voluntary decision to purchase of the bonds from Corpbanca. NOL Ex. 3, p 2 of 6.

Wachovia did not allege, nor could it, that its alleged "loss" was the result of a "judgment" entered in favor of Corpbanca, finding Ms. Di Donato "guilty" of any wrongdoing.

The evidence was thus undisputed that (1) Corpbanca never filed any formal complaint against Wachovia arising out of Ms. Di Donato's conduct, (2) Corpbanca never obtained a judgment against Wachovia, and (3) Wachovia's own internal email reflected that even Wachovia did not believe that it had a "legal" obligation to purchase the bonds from Corpbanca. See Section C4, above.

Given these undisputed facts, as a matter of law, Wachovia's claims against Ms. Di Donato were fatally defective.

As reflected in Ms. Di Donato's Answer, she preserved the appropriate defenses to Wachovia's claims. Ms. DiDonaoto's defenses were further briefed and argued to the Panel, including specific citations to *O'Hara* and other applicable authority. There can be no question that the arbitrators were informed of, and understood, the basic legal principles at issue. Thus, the arbitrators were aware of controlling federal and state authority that, under virtually the identical set of facts, concluded "**there is no set of circumstances under which the [employer] could prove an entitlement to indemnity**".

---

[13] Even if a judgment had been entered against Wachovia in favor of Corpbanca, indemnity would still be inappropriate because, at best, the bid conveyed to Corpbanca was the result of a misunderstanding as opposed to intentional wrongdoing. See, Lab. C. Section 2865.

Under these undisputed facts, the Award is clearly contrary to well-settled legal principles and in manifest disregard for the law. However, should the Court conclude that vacating the Award at this point is not warranted, Petitioner respectfully requests that the Court order the Panel to specify its rationale for finding Ms. Di Donato obligated to indemnify Wachovia for its decision to purchase the bonds from Corpbanca. See, *O'Hara* at p. 1160

## F. CONCLUSION

As the Award reflects, Ms. Di Donato was clearly abused by Wachovia. Despite acknowledging that Wachovia's "losses" were due to Wachovia's voluntary business decision to purchase the bonds from Corpbanca, two of the three arbitrators awarded Wachovia the entire amount of its claims. The Award is unjust, unlawful and these facts clearly justify vacating the Award.

At a minimum, Ms. Di Donato deserves an explanation for what is clearly an arbitrary and capricious award, without any evidentiary foundation and in manifest disregard for the law. Alternatively, Ms. Di Donato respectfully requests that this Court remand the Award to the Panel for further explanation regarding the justification for finding in favor of Wachovia when the undisputed evidence demonstrated that Wachovia's alleged "loss" was the result of a voluntary decision to honor a trade with a customer and not the result of Wachovia being found liable to a third party for the acts of Ms. Di Dinato.

LENDRUM LAW FIRM

Dated: August 22, 2008

By: ______________________

Jeffrey P. Lendrum
Attorneys for Petitioner